## I. STATEMENT OF THE ISSUES

I. Did the Bankruptcy Court err in failing to distinguish pursuant to Bankruptcy Cod §506(b) between the appellant's secured claim and the allowed fees under the agreement under which such claim arose?

II. Did the Bankruptcy Court err in applying a timing element in its analysis of the appellant's significant contribution under Bankruptcy Code §503(b)?

III. Did the Bankruptcy Court err by failing to apply appropriate law interpreting the agreement embedded in the order of sale of the Debtor's assets as that agreement relates to the appellant's secured claim?

IV. Did the Bankruptcy Court abuse its discretion by misreading the agreement embedded in the order of sale of the Debtor's assets as that agreement relates to the appellant's secured claim

V. Did the Bankruptcy Court abuse its discretion by finding that the order of sale of the Debtor's assets constituted a waiver by the appellant of the appellant's right to an administrative claim under the Bankruptcy Code §503(b) and §506(b)?

VI. Did the Bankruptcy Court err by finding that a large cash contribution by a secured creditor to the debtor's estate cannot qualify as a significant contribution under Bankruptcy Code §503(b) regardless of its magnitude?

## II. STATEMENT OF THE CASE

This is an appeal of a ruling of the Bankruptcy Court for the District of Massachusetts (Western Division) in the matter of In. re. CADKEY CORPORATION ("Cadkey"). Cadkey filed a voluntary petition under the Bankruptcy Code Chapter 11 on August 22, 2003.[1] The Appellant, Micro Control Systems Inc., ("MCS") was the sole

[1] Docket #1 in U.S. Bankruptcy Court District Massachusetts (Worcester) Case No. 03-44906-HJB, In. re. Cadkey Corporation. All docket references in this brief refer to that case. For reference, a docket listing produced 4/15/2004 is attached beginning Appendix 1.

secured creditor. MCS submitted an application for approval and reimbursement of its fees.[2] The Bankruptcy Court denied the MCS fee application on the grounds that MCS had agreed to waive its fee reimbursement rights.[3] This is an appeal of that denial.

## III. STATEMENT OF FACTS

1. *Cadkey* was a contentious case that involved substantial negotiations involving many parties including MCS. But for the negotiation and financial contributions made by MCS, that sale would *not* have occurred and *could* not have occurred. Because of MCS's contribution, the sale should result in a dividend to unsecured creditors. The Creditor's Committee described the sale as nothing short of "miraculous".[4] Attorney Fred Meeker, counsel to Mr. Bowers, the principle unsecured creditor, stated that if any recovery to the unsecured creditors is achieved, it will be due to the contribution made by MCS.[5] The Debtor acknowledged that MCS's contribution was critical to the ultimately successful resolution.[6] Kubotek, acknowledged that MCS's contribution was critical to the successful resolution.[7] In other words, all major parties at interest acknowledged that MCS's contribution was important.

2. On or about June 13, 1996, MCS (then known as Cadkey Inc.) sold certain assets to Cadkey Corp. (the "Debtor"), then known as Baystate Technologies, Inc. under an Acquisition Agreement that included a Security Agreement dated June 28, 1996.[8] The Security Agreement calls for the Debtor to pay all expenses incurred by MCS in the

---

[2] Final Application by Micro Control Systems Inc. for approval of Reimbursement of Fees and Costs, Docket #209 entered 12/15/2003 attached beginning Appendix 39.
[3] Order dated 2/12/2004 denying MCS fee application, Docket #246.
[4] Transcript of 12/29/03 hearing, Appendix 104, line 3.
[5] Transcript of 12/29/03 hearing, Appendix 100, lines 6-10.
[6] Email form Debtor's attorney Wilton, Appendix 61.
[7] Email from Kubotek Appendix 137.
[8] Security Agreement, Appendix 52.

process of seeking or enforcing payment of the debt.[9]

3. On the Petition Date, the Debtor filed a Cash Collateral Stipulation negotiated between MCS and the Debtor acknowledging that MCS was a secured creditor and that the amount of the secured debt was $2,181,498.87 in principal and accrued interest of $34,627.50. The Cash Collateral Order was extended a number of times.[10] Since MCS was oversecured, interest continued to accrue. By November, MCS's secured claim plus accrued interest stood at approximately $2.26M exclusive of reimbursable legal fees.

4. On or about September 19, 2003, MCS and the Creditor Committee negotiated a stipulation agreement under which MCS agreed to accept a carve-out.[11]

5. On October 16, 2003, Kubotek Corporation submitted a Qualified Offer for the Debtor's assets in the amount of $2,850,000.[12] The amount of that bid substantially exceeded MCS's secured claim. The claim by MCS was therefore unquestionably oversecured.

6. At an in-court auction held on October 27, 2003, Kubotek was determined to be the winning bidder but was not granted "good faith purchaser" status. MCS and Kubotek held various negotiation discussions regarding ways of proceeding with the sale in light of the Court's determination. Kubotek informed MCS that it intended to increase its offer to $3,600,000 but that it believed that would be insufficient of itself to induce Mr. Bowers to agree to withdraw his objection to the sale. Kubotek requested that MCS make a significant contribution to the estate. MCS agreed. Kubotek regarded MCS's

---

[9] Appendix 58.
[10] See, for example, Cash Collateral, Appendix 105.
[11] Carve-out Stipulation, Appendix 121.
[12] Notice of Submission of Bid Filed by Creditor Kubotek Corp, Docket #105

contribution as crucial.[13] Shortly thereafter, Kubotek submitted a revised offer coupled with the requirement that Bowers provide a specified release. MCS proceeded to negotiate a contribution to the estate of $400,000 made as a reduction of its secured claim and implemented as an amendment to the carve-out stipulation. From the time of these negotiation until after the sale had closed, the Creditor's Committee understood the final negotiated reduction of MCS's secured claim to be $400,000.[14]

7. By request, MCS provided the Creditors Committee with a statement of debt. That statement showed the level of debt consisting of principle plus interest due to MCS to stand at $2.26M. MCS also disclosed to the Creditors Committee its estimate of accrued reimbursable legal fees.

8. In describing the proposed revised Sale Order to the Court on November 6, 2003, Jim Wilton, attorney for the Debtor described the concession made by MCS and thanked MCS on the record for making that concession.[15] The Creditors' Committee endorsed Attorney Wilton's statements in their entirety.[16]

9. The revised Sale Order modified the Carve-Out Agreement in certain limited ways. The Sale Order states in pertinent part as follows: [17]

> "The Stipulation is hereby amended to eliminate the carve-out provided for therein. In lieu thereof and in consideration for (1) receipt of the release by Bowers in the form attached hereto as Exhibit B, and (2) payment of $1,860,000 at closing (of which $25,000 shall be placed in the reserve described in paragraph 4 below), MCS's secured claim as determined by compromise agreement with MCS shall be reduced to $1,860,000, which amount shall be paid to MCS by wire

---

[13] Email from Kubotek, Appendix 137.
[14] Transcript of hearing held January 27, 2004, Appendix 163, line 19.
[15] The transcript of the Nov 6, 2003 hearing has been included in the Appellee's Designation of Additoinal Items to be Included in the Record On Appeal. As of this date, no transcript has been provided to MCS and MCS believes the transcript has not yet been created. MCS was represented at the hearing by Attorney Davies who has personal recollection of Attorneys Wilton and Goldberg comments. To the extent that the record reflects otherwise, MCS reserves its right to amend this brief.
[16] Transcript of Nov 6, 2003 hearing not yet available.
[17] Sale Order, paragraph 3, Appendix 172.

transfer at the closing of the sale. *No other change to the Stipulation is made or implied*." (emphasis added)

10. Under the revised Sale Order, Mr. Bowers, who represented over 90% by value of the unsecured debt, explicitly released all administrative claims.[18] By contrast, MCS did not release administrative or other claims.

11. The final terms of the revised Sale Order as they relate to MCS's secured claim were negotiated on behalf of the Debtor by Attorney Fontana on November 5, 2003. All prior discussions with Attorney Wilton, whether or oral or written, were superseded by negotiations with Attorney Fontana which were ultimately reduced to writing and incorporated into the Sale Order.[19]

12. On November 14, 2003, unsecured creditor Robert White filed a Notice of Election of Appeal to the District Court. This was followed by extensive negotiations involving MCS in which MCS conceded use of funds in fighting the White appeal. The Debtor and the Creditor Committee acknowledged that this concession by MCS was critical in convincing Bowers to continue toward closing.[20]

13. At a hearing on November 17, 2003, MCS reiterated its reservation of rights including but not limited to its right for reimbursement of expenses under Code §506.[21] MCS again reiterated its reservation of rights at a hearing on November 25, 2003.[22]

14. For the entire period of this case and for years prior to the Debtor's filing its Petition, MCS has been cooperative with the Debtor. [23] MCS's cooperation

[18] Sale Order, paragraph 2, Appendix 172.
[19] Email correspondence Appendix 138-9.
[20] Transcript of Hearing held November 6, 2003 not yet available.
[21] Transcript of Hearing held November 17, 2003, Appendix 185, line 25 through 186 line 21.
[22] Transcript of Hearing held November 25, 2003, Appendix 189, line 1-4.
[23] See, for example, email from Debtor's attorney Jim Wilton dated December 2, 2003 shown as Appendix

encompassed but was not limited to (a) multiple forbearance agreements, (b) negotiating with the Debtor at the Debtor's request and standing prepared to act as a stalking horse purchaser (a role ultimately filled by IMSI), (c) making a $400,000 contribution to the Debtor's estate, and (d) contributing up to $25,000 toward the White appeal defense.

15. MCS submitted an application seeking reimbursement for legal expenses in the amount of $74,785.00.[24] The Debtor and the Official Committee of the Unsecured Creditors filed an Objection to the MCS fee request.[25] MCS filed a Response to the Objection.[26] A hearing on the MCS application was held February 12, 2003.[27] The Bankruptcy Court denied MCS's application.[28] The Creditors' Committee represented at a hearing January 27, 2004 that it understood that MCS had ultimately made a $400,000 compromise.[29]

## IV SUMMARY OF THE ARGUMENTS

The Court failed to distinguish between the creditor's secured claim and the allowed fees under which such claim arose even though the plain language of Bankruptcy Code §506(b) makes that distinction. As a matter of law, the Court erred in holding that "§506(b) does not present a second claim. It is part of the claim that is set forth in §506(a)". Appendix 196, line 17.

---

61.

[24] Final Application by Micro Control Systems Inc. for approval of Reimbursement of Fees and Costs, page 1, Appendix 39.
[25] Joint Objection of the Debtor and the Official Committee of Unsecured Creditors to the Final Application for Approval of Reimbursement of Fees and Costs Due to Secured Creditor Micro Control Systems, Inc., Docket #220.
[26] Response of Micro Control Systems Inc. to Joint Objection of the Debtor and the Official Committee of Unsecured Creditors to the Final Application for Approval of Reimbursement of Fees and Costs Due the Secured Creditor Micro Control Systems, Inc., Docket #242 attached beginning Appendix 126.
[27] Transcript of Feb 12, 2003 hearing, Docket #288, Appendix 190.
[28] Order dated 2/12/2004 denying MCS fee application, Docket #246.
[29] Transcript of hearing held January 27, 2004, line 19, Appendix 163.

Although the Court did not reach the issue of substantial contribution under Code §503(b) it nevertheless impermissibly applied a timing test in analyzing that MCS's contribution.

The Court failed to properly apply contract law in analyzing the stipulated agreement incorporated into the Sale Order. The Court based its analysis on inadmissible hearsay evidence rather than looking to the document itself where the document was unambiguous. The agreement between parties said that "no other change to the Stipulation is made or implied." The Court inappropriately read changes into the agreement.

## V. ARGUMENTS

**First issue on appeal: Did the Bankruptcy Court err in failing to distinguish pursuant to Bankruptcy Code §506(b) between the appellant's secured claim and the allowed fees under the agreement under which such claim arose?**

**A. The plain language of the Bankruptcy Code §506(b) distinguishes between the "secured claim" of a creditor and the "allowed fees under the agreement under which such claim arose."**

16. Section 506(b) states in pertinent part "To the extent that *an allowed claim* is secured by property . . .there shall be allowed to the holder of *such claim* . . . any reasonable fees, costs, or other charges provided for under the agreement under which *such claim* arose" (emphasis added). That section of the Code refers to the allowed claim three times. The Code then uses the compulsory language "shall" to describe additional rights that a secured creditor has in addition to payment under the claim itself. In addition to payment of the claim, a secured creditor shall be allowed costs and other charges. Those charges are in addition to and not part of "such claim."

17. Case law distinguishes between an allowed claim and reimbursable fees

due that result from the claim. See e.g. *Kord Enters. II v. California Commerce Bank (In re Kord Enters. II), 139 F.3d 684, 687 (9th Cir. 1998).* All of the litigation regarding payment of attorneys fees to oversecured creditors attests to the difference between a secured claim and the fees.

**B. Fees and claims have different distribution priority.**

18. In fact, §506(b) declares fee reimbursement to be distinguished from the secured claim to the point that it receives different distribution priority compared to the claim itself. Unlike payment of the secured claim, associated fees are to be allowed only after recovery by the trustee under §506(c). In some cases, there may be insufficient funds available to pay either the trustee under §506(c) or the secured creditor under §506(b). In other cases, there may be sufficient funds available to pay both the trustee and the secured creditor recovery under §506(c) and (b) respectively. In some cases, funds may run out after paying the trustee and before paying the secured creditor's fees. In that event, the Code requires that the secured creditor get paid his "claim", that the trustee get paid for his work, and that the secured creditor does not get reimbursed his fees. The fact that the claim and the fees are subject to different payment priority proves that they are separate and distinct.

19. Here, the Bankruptcy Court confused and combined the claim and the fees which §506(b) states shall be added to the claim. The court found that "the secured creditor reached an agreement with the debtor and the unsecured creditor to cap its claim".[30] In reaching that conclusion, the court chose to combine the secured claim and

[30] Transcript of hearing held January 27, 2004, Appendix 196 line 9.

the associated fees into one conceptual "claim" without distinguishing between the "secured claim" and the items to be added to the secured claim contingent on the facts of a particular case. This seemed reasonable to the Court at least in part on the theory that the secured claim and the fees due under that claim are both secured by collateral and in this instance would have the same effective priority because the estate would theoretically have enough money to pay both. The Court incorrectly used the facts of this case to interpret the Code. Whether or not two payments are made does not mean that they derive from the same obligation or that they are paid by virtue of the same section of the Code. The Court's analysis was flawed and inconsistent with higher court analysis of payment of fees.

**C. MCS is due fee reimbursement if it satisfies the requirements under §506(b) without the addition of other requirements.**

20. The language of the section is clear. The creditor is entitled to attorneys' fees if (1) the claim is an allowed secured claim, (2) the creditor is oversecured, (3) the fees are reasonable, and (4) the fees are provided for under the agreement. *Kord Enters. II v. California Commerce Bank (In re Kord Enters. II), 139 F.3d 684, 687 (9th Cir. 1998).* The court is not permitted to legislate additional restrictions into §506(b) that were not included in the section itself. In *Kord*, the plaintiff argued that an oversecured bank should not receive reimbursement for fees incurred for litigated issues peculiar to federal bankruptcy law. The 9th Circuit Court of Appeals refused to allow the introduction of additional restrictions on fee reimbursement. Similarly, The 8th Circuit has held that an oversecured creditor need only meet the requirements of §506(b) to be eligible for attorneys' fees and the Court did not impose additional limitations on oversecured

creditors. *First W. Bank & Trust v. Drewes (In re Schriock Constr., Inc.), 104 F.3d 200, 201 (8th Cir. 1997)*.

21. The value of a secured creditor's interest is not identical with the secured claim itself. *United Savings Association v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 372*. A secured creditor's right of fee reimbursement is an interest but is not itself part of the secured claim.

**Second issue on appeal: Did the Bankruptcy Court err in applying a timing element in its analysis of the appellant's significant contribution under Bankruptcy Code §503(b)?**

**A. The plain language of the Code contains no timing test.**

22. Section 503(b) of the Code states in pertinent part "there shall be allowed administrative expenses . . . including (3) the actual, necessary expenses . . . incurred by . . . (D) . . . an equity security holder . . . in making a substantial contribution in a case under chapter 9 or 11 of this title." The Bankruptcy Code does not call for application of a time test. Nevertheless, the Bankruptcy Court stated that MCS's claim was capped if it occurred before MCS agreed to cap its claim. The Court was adding a test not included in the Code and not permitted by the Code.

23. The Bankruptcy Court is not permitted to add conditions to the Code that restrict the right of a secured creditor. *Kord Enters. II v. California Commerce Bank (In re Kord Enters. II), 139 F.3d 684,*

**Third issue on appeal: Did the Bankruptcy Court err by failing to apply appropriate law interpreting the agreement embedded in the order of sale of the Debtor's assets as that agreement relates to the appellant's secured claim?**

**A. Since the Sale Order embedded an agreement between parties, that agreement should be interpreted according to contract law.**

24. An order of the bankruptcy court that embeds and agreement is to be construed as a contract. See *Linsenmeyer v. United States (In re Linsenmeyer), 2003 U.S. App. Lexis 23635, 5 (6th Cir. 2003)* quoting *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993)* ("A reorganization resembles a consent decree and therefore, should be construed basically as a contract.") A stipulation is certainly a contract.

25. The Court determined that MCS "agreed" to waive its right of fee reimbursement. The Court came to this extraordinary conclusion solely because MCS agreed to make a contribution to the Debtor's estate. The law of agreements is the law of contracts. MCS's purported "agreement" should be interpreted in light of contract law.

26. If a party to an agreement has certain rights before entering into that agreement, the party retains those rights unless the party explicitly or implicitly waives or gives up those rights. Here, MCS explicitly *retained* all of its rights.

27. MCS did not agree to waive its right of reimbursement. In fact, MCS negotiated for and preserved its right of reimbursement. The relevant language in the Sale Order clearly states that MCS is making an "agreement" and explicitly limits the reach of that agreement. The Sale Order calls out that "No other change is made or implied." Prior to agreeing to entry of the Sale Order, MCS unquestionably had the right of reimbursement. Since the Sale Order makes no reference to MCS waiving its right, MCS retained that right even after the Sale Order was entered.

28. The Sale Order was drafted by the Debtor. The Debtor knew how to draft language that would indicate a release of administrative claims. In fact, the Debtor did draft just such language with regard to a release of administrative claims by Mr. Bowers. In paragraph 2 of the Sale Order, Mr. Bowers releases administrative claims. No such language appears in the Sale Order with regard to MCS. It could not appear because the MCS would not have agreed to it. In fact, MCS negotiated contrary language to assure that MCS was not releasing its rights. Debtor knew that MCS insisted on seeking fee reimbursement. The Debtor adjusted the language to reflect MCS's desire to seek reimbursement.

29. Immediately before finding that MCS had heard inadmissible testimony by Debtor's Attorney Wilton in which he revealed alleged compromise discussions.[31] Those discussions were privileged, if they occurred at all.

30. Moreover such discussions would have been irrelevant because Attorney Wilton was not involved in the final negotiation of the Sale Order as it related to MCS's secured claim. The Debtor was represented in those discussions by Attorney Fontana. Attorney Fontana had drafted, circulated it to relevant parties including MCS, and negotiated changes to her draft. Attorney Fontana's communication with parties at interest post-dated and superseded any discussions in which Attorney Wilton was involved.

31. Attorney Fontana is listed by the Bankruptcy Court as the principal attorney representing the Debtor. Attorney Fontana's services have cost the estate well over $70,000. MCS reasonably believed that it could rely on negotiations concluded with

Attorney Fontana even if the results were inconsistent with earlier oral or written comments made by Attorney Wilton.

**B. Entry of an agreement as part of a court order does not of itself alter the agreement or change the methodology of interpretation of that agreement.**

32. Fee reimbursement is authorized by many statutes in many jurisdictions in many areas of law. For example, federal law authorizes legal fee reimbursement in cases of discrimination, union contract negotiation, and bankruptcy. Our court system encourages out of court settlement in all areas of law. Frequently, a settlement is endorsed by the relevant court through entry of a court order containing the agreement. In that event, the agreement is enforceable by the court. By entering an order, the court does not alter the agreement. The court merely alters the way the agreement is enforced. The court does not guarantee that the agreement is free from ambiguity and frequently an agreement must be interpreted according to the law of contracts even after it is entered. In this case, the agreement in question was a stipulated agreement between contracting parties.

**Fourth issue on appeal: Did the Bankruptcy Court abuse its discretion by misreading the agreement embedded in the order of sale of the Debtor's assets as that agreement relates to the appellant's secured claim**

**A. MCS never voluntarily waived its right of reimbursement.**

33. The agreement embedded in the Sale Order unambiguously calls for a limitation on the changes that are made in the carve-out Stipulation. It is undisputed by the Objectors that MCS had a right to seek reimbursement under §506 at least until the revised Sale Order was entered on November 7, 2003.

---

[31] Transcript of hearing held February 12, 2004, Appendix 194-5.

34. The Objectors allege that MCS waived its rights by failing to object to the revised Sale Order as entered on November 7. In support of that allegation, the Objectors materially misstate both the negotiations leading up to the revised Sale Order and the Sale Order itself. In particular, the Objectors attach to their objection an Exhibit A which purports to be a red-line version of the Sale Order as it existed on Wednesday November 5. The Objectors would have had the Court believe that this document was the final version existing prior to the November 6 Sale Order hearing. It was not.

35. On November 5, MCS negotiated with Debtor Attorney Fontana and insisted on specific language that recognized that MCS was not waiving any rights. MCS insisted on inclusion of the critical language "No other change to the Stipulation is made or implied." The Objectors compounded their misrepresentation to the Court by both omitting this critical language from their purported agreement and then alleging that ". . . Otherwise, the Sale Order remained unchanged in all relevant respects".[32] That was simply false. The Sale Order contained the important language referenced above.

36. Moreover, all parties understood on November 5 that MCS intended to seek reimbursement for fees and costs. MCS had made that clear to Attorney Fontana. MCS's rights under Code §§503(b) and 506(b) survived the revised Sale Order.

**B. Both the Creditors Committee and the Debtor knew that MCS had not waived its right of reimbursement of fees.**

37. The Creditors Committee knew that the debt due to MCS stood at $2.26M exclusive of legal fees. The Creditors Committee understood that MCS accepted a

[32] See Joint Objection fn3, pg 4, Docket #220, Appendix 199-200.

$400,000 reduction in its secured claim.[33] ("a compromise with Micro Control Systems that resulted in $400,000 being available for distribution to creditors.") The revised Sale Order reduced MCS's secured debt to $1.86M. If a compromise had been agreed that included waiver of MCS's statutory right to fee reimbursement, the reduction would have been well over $450,000.

38. MCS's compromise to accept $1.86M was made by amendment to the Carve Out stipulation. The Committee accepted language in the Sale Order that said "No other change to the Stipulation is made or implied." That language was closely negotiated with Debtor's Attorney Fontana.[34] The Committee knew that MCS was not waiving its right of fee reimbursement.

39. The Debtor knew that MCS had not waived its right to reimbursement. Final negotiations regarding the revised Sale Order occurred between Attorney Davies for MCS and Attorney Fontana for the Debtor. With regard to the Agreement in Respect of Micro Control System, Inc.'s Secured Claim, the agreement was nothing more or less than an amendment to the Stipulation between MCS and the Creditors' Committee.

40. After entry of the revised Sale Order on November 7, Debtor's Attorney Wilton sought to shoe-horn his personal view into the record knowing that his view was not consistent with the agreement negotiated by his colleague, Attorney Fontana. Mr. Wilton for the first time in court documents used language that *could* conceivably be interpreted as a waiver of rights by MCS. He stated that "MCS has agreed to accept $1.86M in full satisfaction of its secured claim."[35] He knew that MCS disagreed with

[33] Transcript of hearing held January 27, 2004, Appendix 163, line 19.
[34] Exhibit "B" to Response of Micro Control Systems, Docket #242, Appendix 139.
[35] EMERGENCY MOTION OF DEBTOR FOR AN ORDER ENFORCING THE TERMS OF THE SALE ORDER DATED NOVEMBER 6, 2003, [Docket 132], Page 3, paragraph 5.

that statement. On Nov 17, Mr. Wilton expected to discuss that Motion at a hearing in this court. MCS was obliged to send representation to the hearing to reiterate on the record that MCS reserved its right to seek reimbursement for fees and costs.[36] Mr. Wilton listened to MCS's statement and made no comment. If he had any legitimate reason to disagree with MCS's position, he should have raised his concern at that time, *before* a sale took place. The Debtor should not now be permitted to raise an issue that it chose to ignore when raising it was timely.

41. MCS again reiterated its reservation of rights at the court hearing on the subject of continued use of cash collateral held on November 25.[37] At that hearing, the Debtor was represented by Attorney Fontana who is shown on the Bankruptcy Court docket report as the principal attorney representing the Debtor. On hearing MCS's reservation of rights again stated on the record, Attorney Fontana was silent. The sale closed on December 2. Prior to closing, neither of the Objectors raised any issue to the Court regarding MCS's reimbursement or reservation of rights even though they knew full well that MCS was expecting reimbursement.

42. Attorney Fontana had circulated many drafts of the Sale Order. By email dated November 5, 2003, Attorney Fontana requested comments on her prior draft of the Sale Order. That same day, Attorney Davies provided the proposed revision that made two important clarifying changes relevant to this appeal. Those changes were (1) the amount of MCS's secured claim was "determined by compromise agreement with MCS" and (2) insertion of the words "No other change is made or implied." Attorney Davies had earlier informed Attorney Fontana that MCS intended to submit a fee reimbursement

---

[36] Transcript of Nov 17, 2003 hearing Appendix185, line 25 through 186, line 5.
[37] Transcript of Nov 25, 2003 hearing Appendix 189, line 1.

request under §506(b). Attorney Fontana could have been in no doubt that MCS intended to preserve its rights of fee reimbursement. Attorney Fontana incorporated into the final Sale Order all of the changes requested by Attorney Davies.

**Fifth issue on appeal: Did the Bankruptcy Court abuse its discretion by finding that the order of sale of the Debtor's assets constituted a waiver by the appellant of the appellant's right to an administrative claim under the Bankruptcy Code §503(b) and §506(b)?**

**A. The Sale Order did not constitute a waiver by the appellant of its right to an administrative claim.**

43. The Sale Order revised the Stipulation made by MCS and the Creditors' Committee. That Stipulation was a contract. Modification of that contract had no effect upon any rights not governed by the contract itself. The Stipulation left intact MCS's right of fee reimbursement.

44. The Sale Order unambiguously places a limit on those items that were changed with regard to the Stipulation. The Sale Order states "no other change to the Stipulation is made or implied." Nevertheless, the Bankrkuptcy Court effectively mandated a change that was not agreed by MCS and cannot reasonably be inferred from the relevant language in the Sale Order. No other change means no other change.

45. Both the Debtor and the Creditors' Committee knew that MCS intended to seek reimbursement of legal fees. The Creditors' Committee understood MCS was accepting a reduction of $400,000 from the outstanding debt amount of $2.26M that was calculated exclusive of legal fees. The Debtor, through its attorney Fontana, negotiated and incorporated the "no other change" language.

46. The only evidence the Debtor has presented in support of its position that MCS waived its right of fee reimbursement is an alleged preliminary compromise

discussion held between Debtor's Attorney Wilton and MCS's Attorney Davies.[38] Not only would that alleged discussion constitute privileged communication inappropriately revealed to the Court, but it would be wholly irrelevant. Final negotiations on the Sale Order did not involve Attorney Wilton but involved Attorney Fontana on behalf of the Debtor. MCS could not be expected to be bound by preliminary oral discussions with an attorney who was not involved in final negotiations. This is especially true when, as here, the final written agreement is not consistent with earlier alleged discussions.

47. The Bankruptcy Court gave impermissible weight to irrelevant and unsupported oral discussions that, if they occurred at all, were superseded by a written agreement.

**Sixth issue on appeal: Did the Bankruptcy Court err by finding that a large cash contribution by a secured creditor to the debtor's estate cannot qualify as a significant contribution under Bankruptcy Code §503(b) regardless of its magnitude?**

**A. Cash is by far the most significant thing to the estate of a debtor.**

48. One of the primary functions of the bankruptcy process is the reduction of assets to cash and the distribution of that cash to the creditors of the estate. It is entirely unreasonable for the Bankruptcy Court to treat cash as though it cannot be "significant" under the meaning of §503(b). Nevertheless, the court dismissed MCS's fee request without first determining whether or not MCS's cash contribution was "significant."

49. The test for "substantial contribution" is whether or not the actions of the applicant conferred a significant and demonstrable benefit to the debtor's estate and the creditors other than itself. A cash contribution is the quintiscential significant contribution. Nothing is more important to the debtor's estate and the creditors than cash.

---

[38] Transcript of hearing held February 12, 2004, Appendix 194-195.

**B. The fact that secured creditors take into consideration their own self interest does not of itself disqualify creditors from reimbursement.**

50. The plain language of the Code notes that secured creditors shall be paid fees under certain circumstances. Two Appellate Courts have recently opined that creditor motivation was not a permissible factor in assessing the significance of the creditor's contribution. In 1997, the Fifth Circuit concluded in the matter of *In re DP Partners, 106 F3d 667 (5th Cir, 1997)* that creditor motivation was irrelevant to a substantial contribution analysis. Later, the 11th Circuit came to a similar conclusion in the matter of *In re Celotex Corp., 227 F.3rd 1336 (11th Cir. 2000)*. In *Celotex*, the 11th Circuit adopted the 5th Circuit holding of *DP Partners* to the effect that "a creditor's motivation in taking actions that benefit the estate has little relevance in the determination whether the creditor has . . . made a substantial contribution to a case." Both appellate courts reasoned that a creditor is a party at interest and by definition therefore has an interest in the results of the case. Being a party at interest therefore cannot *possibly* of itself disqualify a creditor from reimbursement. If Congress had meant to exclude actions taken by a secured creditor because the creditor had an interest in the result, Congress would have excluded creditors from the list of people who could qualify for reimbursement. The *Celotex* court noted that "it is difficult to imagine a circumstance in which a creditor will not be motivated by self-interest in a bankruptcy proceeding. To impose an altruism requirement on the ability to obtain administrative expenses under §503(b)(3-4) would effectively render the section meaningless as to creditors." Whether or not MCS took its own interest into consideration in making a substantial contribution does not in any sense invalidate MCS's contribution or its right to reimbursement of fees.

51. But in point of fact, MCS took much more than its own self-interest into consideration. MCS considered and acted on the interests of Cadkey's customers, resellers, employees, and management. For example, in early November, in negotiations with Mr. Bowers, MCS insisted that as part of the Sale agreement, Mr. Bowers provide a general release to Bob and Karen Bean as partial consideration for MCS's substantial financial contribution. Mr. Bowers balked. Bob Bean was made aware of MCS's position. Through counsel, Bob Bean made a personal request to MCS that MCS relent. Attorney Wilton, counsel to both the Debtor and the Beans, carried Bob Bean's message to MCS. Attorney Wilton said that Bob Bean was "blown away" by MCS's selfless support for him and Karen Bean.

## CONCLUSION

For the above reasons, the denial of the fee application by MCS should be reversed.

Micro Control Systems, Inc.
By its attorney,

Signed /Livingston Davies/____________________
Livingston Davies (BBO# 655443)
P.O.Box 367
Duxbury, MA 02331
Tel: 781.934.6420
Fax: 781.934.6310