UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04-40045-NMG

———————————————

MICRO CONTROL SYSTEMS, INC.

Appellant

v.

CADKEY CORPORATION

Appellee

———————————————

ON APPEAL FROM AN ORDER OF
THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(WESTERN DIVISION)

———————————————

**BRIEF OF APPELLEE**

———————————————

Michael J. Goldberg
    BBO No. 551869
John C. La Liberte
    BBO No. 556046
Pamela A. Zorn
    BBO No. 640800

*Proposed Attorneys for*
*Appellee*

SHERIN AND LODGEN LLP
100 Summer Street
Boston, MA  02110
(617) 646-2000

May 3, 2004

# TABLE OF CONTENTS

Jurisdiction ...................................................................................................................1

Issue Presented ...........................................................................................................1

Standard Of Review ....................................................................................................1

Statement of the Case ..................................................................................................2

Statement of Facts .......................................................................................................3

Argument ....................................................................................................................9

    I.    The Bankruptcy Court Did Not Abuse Its Discretion In Denying MCS's
Fee Application ..........................................................................................9

        A.    The Bankruptcy Court Correctly Found That MCS Compromised Its
Secured Claim And Waived Its Right To Reimbursement Of Legal
Fees And Costs ...............................................................................10

        B.    Having Compromised Its Secured Claim, MCS Is Not Entitled To
Recover Fees and Fees and Costs Under Bankruptcy Code §506(b) ........13

        C.    The Court Correctly Found That MCS Is Not Entitled To Recover
Attorneys' Fees and Costs As a Substantial Contribution Under
Bankruptcy Code §503(b)(3)(D) .......................................................13

Conclusion .................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

In re 1095 Commonwealth Corp., 236 B.R. 530 (D. Mass. 1999) ..................................1.9

In re 1095 Commonwealth Corp., 204 B.R. 284 (Bankr. D. Mass. 1997) ..........................15

In re Automatic Spring Prods., Inc., 50 B.R. 6 (Bankr. S.D. Fla 1985) ...........................14

In re Brown, 147 B.R. 55 (Bankr. D. Mass. 1992) ............................................13, 14

In re Lloyd, Carr & Co., 2 B.R. 714 (D. Mass. 1979) ........................................2, 10

In re Shapiro, 208 B.R. 318 (E.D.N.Y. Bankr. 1997)...........................................13

In re Winthrop Old Farm Nurseries, 50 F.3d 72 (1st Cir. 1995) ..............................1, 9

Lebron v. Mechem Financial Inc., 27 F.3d 937 (3rd Cir. 1994)...................................14

**Codes**

11 U.S.C. s503 (b) (3) (D) ..........................................................................passim

11 U.S.C. s506 (b)...............................................................................1, 9, 13

## Jurisdiction

This appeal is taken from the Bankruptcy Court's order denying Micro Control Systems, Inc.'s Final Application for Approval of Reimbursement of Fees and Costs Due the Secured Creditor Micro Control Systems, Inc. The Bankruptcy Court's order is a final and appealable order, which this Court has jurisdiction to hear under Fed. R. Bankr. P. 8001.

## Issue Presented

Appellant contends that the Bankruptcy Court erred by denying its request for reimbursement of attorneys fees and costs notwithstanding that Appellant had agreed, by contract, to accept a fixed claim at the time of the closing of the sale of Debtor's assets, attended the sale hearing, and did not object to the terms of the Sale Order, which incorporated Appellant's agreement to limit its claim. In particular, Appellant contends that the Bankruptcy Court erred in finding that its agreement to cap its claim precluded its recovery of attorneys' fees and costs under 11 U.S.C. §506(b). Finally, Appellant contends that it substantially contributed to Debtor's estate and, thus, the Court erred in ruling that it was not entitled to recover its fees and costs under 11 U.S.C. §503(b)(3)(D).

## Standard of Review

"A district court reviewing a bankruptcy court's decision applies 'the clearly erroneous standard to findings of fact and de novo review to conclusions of law.'" In re 1095 Commonwealth Corp., 236 B.R. 530, 535 (D. Mass. 1999), quoting In re Winthrop Old Farm Nurseries, 50 F.3d 72, 73 (1st Cir. 1995) (further citations omitted). "For an appellate court reviewing factual findings, the abuse of discretion standard is indistinguishable from the clearly erroneous standard." Id. (internal quotations omitted). A court is accorded broad discretion in deciding bankruptcy fee application, which is "subject to interference only on a showing of an

abuse of discretion of the application of incorrect legal principles." See In re Lloyd, Carr & Co., 2 B.R. 714, 715 (D. Mass. 1979).

### Statement of the Case

On August 22, 2003, (the "Petition Date"), CADKEY Corporation (the "Debtor") filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code. On August 29, 2003, Debtor moved the United States Bankruptcy Court for the District of Massachusetts (Western Division) for an order approving the sale of substantially all of Debtor's assets (the "Sale Motion"). Shortly thereafter, Micro Control Systems, Inc. ("MCS"), Debtor's primary secured creditor, agreed to enter into a carve-out stipulation (the "Carve-Out Stipulation") with the Official Committee of Unsecured Creditors (the "Unsecured Creditors' Committee" or "Committee"), under which MCS agreed to reduce its secured claim of approximately $2.2 million (plus interest and other charges) by an amount to be determined based on the ultimate sale price. The purpose of the agreement was the ensure that the Debtor's unsecured creditors would receive a dividend on their claims from the sale proceeds; based on the proposed purchase price for the Debtor's assets and the size of MCS's secured claim, it was not at all certain that such a dividend could be paid without MCS's agreement.

Despite the Committee's agreement with MCS, two unsecured creditors objected to the proposed sale. Subsequently, amidst stalled negotiations to resolve these objections, MCS agreed to amend the Carve-Out Stipulation and cap its claim at $1,860,000 – an agreement that resulted in the withdrawal of one of the two objections. On November 6, 2003, over the remaining objection of Robert White, the Court (Boroff, J.) entered an order approving the sale of Debtor's assets for approximately $3.6M to Kubotek Corporation ("Kubotek") (the "Sale Order"). The Sale Order provided that "MCS's secured claim as determined by compromise

2

agreement with MCS shall be reduced to $1,860,000, which amount shall be paid to MCS by wire transfer at the closing of the sale." Consistent with that sale order, on December 2, 2003, the sale closed and MCS received, by wire transfer, $1,835,000. (MCS agreed to keep $25,000 in escrow to fund the White Appeal, see infra).

On December 15, 2003, MCS submitted a fee application, seeking reimbursement for $75,785.00 in legal expenses incurred in the Cadkey Bankruptcy. The Debtor and the Unsecured Creditors' Committee jointly objected to MCS's fee application on December 22, 2003. MCS filed a response to the joint objection on February 3, 2004. After hearing, the Court denied MCS's fee application on February 12, 2004, ruling, *inter alia*, that MCS "reached an agreement with the debtor and the unsecured creditor to cap its claim", which "itself constituted a waiver of its claim and estopped the secured creditor from asking for any more. But even if waiver and estoppel did not apply, the agreement was incorporated in an order, the order became final, and the matter was closed." The Court held that it did not need to reach MCS's argument under 11 U.S.C. §503(b)(3)(D) because, even if MCS contributed to the Debtor's estate, its right to be compensated for that contribution was subject to its agreement to cap its claim. Once it agreed to cap its claim, that agreement voluntarily foreclosed any additional recovery.

## Statement of Facts

Prior to the sale of its assets to Kubotek, Debtor was a software company based in Marlborough, Massachusetts and engaged in the development, manufacture, and distribution of PC-based, mechanical engineering computer-aided design (CAD) software systems used by designers and manufacturers worldwide. See Trustee's Appendix ("TA") 0077-0078, 1086.[1] As

---

[1] Appellant failed to assemble a complete record appendix. Not only did Appellant fail to include full copies of each of the documents that it designated, but it also failed to include any of Appellee's designations. Appellant's Appendix is referred to herein as "AA". For the convenience of the Court, Appellee has assembled its own record appendix which is submitted herewith and referred to herein as the Trustee's Appendix ("TA").

of the Petition Date, Debtor had 26 employees and more than 6,000 customers worldwide serviced through a sales network of over 50 distributors. See TA 1086.

On June 7, 2000, Debtor was found liable for patent and copyright infringement and breach of contract on claims brought by Harold L. Bowers (the "Bowers Litigation"), and Bowers was awarded judgment against the Debtor in the approximate amount of $5.9 million.[2] TA 0099. Bowers subsequently obtained an injunction prohibiting Debtor from infringing upon Bowers intellectual property (the "Injunction"). Id. The Federal Circuit reversed the patent infringement finding but affirmed the breach of contract finding and the judgment. Id. The Supreme Court denied the Debtor's petition for writ of certiori for the breach of contract judgment. Id.

### Debtor's Bankruptcy

On August 22, 2003, after Bowers sought a writ of execution to satisfy the litigation judgment of approximately $5.9 million, Debtor filed its voluntary petition for relief under Title 11 of the United States Code (the "Petition Date," as defined above). TA 1085, 1088. That same day, Debtor signed an asset purchase agreement with International Microcomputer Software, Inc. ("IMSI"), a well-capitalized strategic purchaser. TA 1113-1140. The parties set the purchase price at $2.5 million, subject to Bankruptcy Court approval. TA 1119.

### Bowers's Objection to the Sale to IMSI

On August 29, 2003, Debtor filed a motion seeking Bankruptcy Court approval of the sale of substantially all of its assets to IMSI, subject to higher and better offers (the "Sale Motion," as defined above). TA 1084-1179. The Sale Motion also sought approval of the

---

[2] The District Court originally entered judgment for Bowers in the amount of $5,270,142. TA 0099. On July 11, 2003, the District Court entered an amended judgment in the amount of $5,877,355.82 (including pre and post-judgment interest). Id. As of the Petition Date, accruing interest had increased the amount of the judgment to $5,900,091.14. Id.

procedures to be utilized by Debtor in soliciting higher and better offers (the "Auction Procedures"). Id. Bowers thereafter advised Debtor of his intent to object to the proposed sale to IMSI. See TA 0599-0600. Bowers claimed that certain of Debtor's products infringed on Bowers's intellectual property rights in violation of the Injunction. See id. Bowers insinuated that if IMSI purchased Debtor's assets without a release, Bowers would seek legal redress against IMSI. See id. On September 8, 2003, the day before the scheduled Bankruptcy Court hearing on the Auction Procedures, IMSI terminated its agreement to purchase the Debtor's assets in response to Bowers' threats of future litigation. See id.

In response, and in light of Bowers's anticipated objections to the sale, Debtor amended the Sale Motion. TA 0602. The amended Sale Motion continued to seek a Court order that Debtor's assets would be sold free and clear of all liens, claims and encumbrances (with a few exceptions). TA 0605. The amended Sale Motion also sought a Court order which would allow Debtor to sell its assets free and clear of any alleged interests Bowers had in Debtor's intellectual property. Id. In sum, Debtor sought a ruling from the Bankruptcy Court that Debtor's sale would not violate the Injunction. Id.

At a hearing on the proposed Auction Procedures held on September 12, 2003, Bowers objected to the Bankruptcy Court's authority to conduct the asset sale. See TA 0607-0612. The Court nonetheless entered an order approving the Auction Procedures, and scheduled a hearing to consider the proposed Sale Order on October 20, 2003. TA 0640.

**Official Unsecured Creditors Committee and
Micro Controls Systems, Inc. Enter Into Stipulation**

On September 19, 2003, the Unsecured Creditors' Committee and MCS, the principal secured creditor of the Debtor, entered into the Carve-Out Stipulation. TA 0234-0244. Pursuant to the Carve-Out Stipulation, MCS agreed to reserve for distribution to the Debtor's unsecured

5

creditors a portion of the Sale proceeds otherwise payable to MCS as a secured creditor of the Debtor. TA 0235. Specifically, MCS agreed that:

> From any proceeds it receives from the closing of the Sale to IMSI or another purchaser (the "Purchaser") pursuant to the Sale Motion and the Order, MCS shall reserve and remit to the Committee a carveout (the "Carveout") for distribution to the unsecured creditors of the Debtor in an amount determined as follows:

| | | |
|---|---|---|
| (a) | If the purchase price payable by such Purchaser is $3,000,000 or less: | |
| (b) | If the purchase price payable by such Purchaser is greater than $3,000,000 but not more than $3,500,000 | $250,000 |
| | | $200,000 |
| (c) | If the purchase price payable by such Purchaser is greater than $3,500,000 but not more than $4,000,000 | |
| | | $100,000 |

TA 0236. If the purchase price exceeded $4,000,000, MCS was no longer obligated under the Carve-Out Stipulation to reserve and pay a Carve-Out. Id. The Court approved the Carve-Out Stipulation on September 26, 2003. See TA 0232.

<u>The Auction</u>

The auction for the sale of Debtor's assets commenced on October 20, 2003. See TA 0682. IMSI's $2.5 million offer stood as the first bid. TA 0687-0688. Kubotek bid $2.85 million and was found to have submitted the highest and best offer. See TA 0393, 0688. Kubotek conditioned its bid on a finding that the purchase did not violate the Injunction. See TA 0690. Bowers and Robert White objected to the sale and the entry of the order sought by Kubotek. TA 0691-0692. On October 30, 2003, after hearings in the Bankruptcy Court and the District Court, Debtor's counsel announced that progress had been made in negotiations to resolve the objections to the sale. TA 0870- 0871. In particular, Kubotek agreed to increase the total consideration for the sale in consideration for a full release from Bowers, a license to a certain portion of his software, and any other intellectual property rights that he possessed. TA

0871. In addition, MCS agreed, in lieu of its carve-out, to reduce its claim to $1.86 million, about $400,000 less than the full amount of its secured claim.  TA 0871-0872.

MCS's Agreement
<u>To Accept $1,860,000 In Satisfaction Of Its Claims</u>

In an effort to effectuate the sale, the Debtor, Kubotek, the Unsecured Creditors' Committee and MCS negotiated to resolve definitively all of MCS's claims against the estate. Initially, the negotiations focused simply on MCS reducing its secured claim by $400,000.  <u>See</u> TA 1055.  Debtor's counsel proposed two alternatives for incorporating the parties' agreement in the Sale Order.  The alternatives were: (i) the sale order would provide that MCS's secured claim would be allowed in a fixed dollar amount at closing, reflecting the compromised amount of MCS's secured claim, with payment of be made by wire transfer at the close of the sale; or (ii) the sale proceeds would be held in escrow while MCS and any other claimants could file claims against such proceeds, and MCS's ultimate recovery, as determined by the Court, would thereafter be reduced by $400,000, as agreed-upon by the parties.  <u>Id</u>.  Debtor's counsel told counsel for MCS that either alternative would be acceptable.  <u>Id</u>.  MCS opted for the former approach.  <u>Id</u>.

Accordingly, on November 5, 2003, the Debtor circulated a revised sale order reflecting this agreement.  TA 1055.  Consistent with the negotiations, the "redlined" draft of the sale order demonstrates that the parties had initially contemplated an agreement under which "MCS's secured claim as determined by the Court shall be reduced by $400,000 which amount shall be retained by the estate" but ultimately revised that agreement to provide that "MCS's secured claim as determined by the Court shall be reduced to $1,860,000, which amount shall be paid to

7

MCS by wire transfer at the closing of the sale."[3] TA 1055, 1072. MCS agreed to this revised sale order. Id.

### The Sale Order

On November 6, 2003, the Court entered an order (the "Sale Order") approving the sale of substantially all of the Debtor's assets to Kubotek in accordance with the terms and conditions of an Asset Purchase Agreement between Kubotek and the Debtor dated October 16, 2003, as modified on the record at the sale hearing and by the terms of the Sale Order. AA 165-179.

The Sale Order effected the terms of a settlement between the Debtor, the Unsecured Creditors' Committee, MCS, Kubotek and Bowers, and resolved Bowers objections to the Sale Motion. Id. Specifically, the Sale Order provided for the payment by Kubotek of $750,000 to Bowers in consideration for (i) the withdrawal of Bowers' objection to the Sale, (ii) the delivery of a release of claims against Kubotek, employees of the Debtor retained by Kubotek (other than Robert Bean and Karen Bean) and sales agents, distributors or retailers of the Debtor's business, and (iii) Bowers' release of any administrative claims against the estate. AA 171-172. The settlement also provided for payment of $1,860,000 to MCS in full satisfaction of MCS's secured claim:

> MCS's secured claim as determined by compromise agreement with MCS shall be reduced to $1,860,000, which amount shall be paid by MCS by wire transfer at the closing of the sale.

AA 172. Of the $1.86 million payable to MCS, $1.835 million was to be paid to MCS at closing, and $25,000 was to be paid into a segregated account to fund a portion of the costs of the Debtor's defense of an appeal of the Sale Order filed by Robert White (the "White Appeal"). AA 172-174. Under the terms of the Sale Order, MCS will receive a portion of the $25,000 if

---

[3] At the sale hearing, this language was revised further to reflect the reality that MCS's secured claim was "determined by compromise" rather than "determined by the Court." TA 1055.

costs of defending the White Appeal do not exceed $50,000. AA 173-174. The Sale closed on December 2, 2003. TA 1056. On that day, as agreed, $1,835,000 was wired to MCS and the remaining $25,000 was held in reserve to fund the potential costs of defending the White Appeal. Id.

### MCS's Fee Application

On December 15, 2003, MCS filed an application seeking reimbursement of $74,785.00 in legal expenses and fees incurred by MCS in the Cadkey Bankruptcy. AA 39-96. The Debtor and the Unsecured Creditors' Committee jointly objected to this application. TA 1053-1083. After hearing on February 12, 2004, the Court ruled that MCS reached an agreement with the Debtor and the Unsecured Creditors' Committee to cap its claim at $1.86 million. TA 1051. The Court further found that, even if MCS's agreement to accept $1.86 million in full satisfaction of its secured claims did not constitute a waiver of its claim for fees, it was incorporated in the Sale Order, which, once approved by the Court, became final and the matter closed. Id. The Court held that MCS's agreement to reduce and cap its claims at $1.86 million precluded recovery of fees under either 11 U.S.C. §506(b) or §503(b)(3)(D). TA 1051-1052.

### Argument

## I. The Bankruptcy Court Did Not Abuse Its Discretion In Denying MCS's Fee Application

"A district court reviewing a bankruptcy court's decision applies 'the clearly erroneous standard to findings of fact and de novo review to conclusions of law.'" In re 1095 Commonwealth Corp., 236 B.R. 530, 535 (D. Mass. 1999), quoting In re Winthrop Old Farm Nurseries, 50 F.3d 72, 73 (1st Cir. 1995) (further citations omitted). "For an appellate court reviewing factual findings, the abuse of discretion standard is indistinguishable from the clearly erroneous standard." Id. (internal quotations omitted). A court is accorded broad discretion in

deciding bankruptcy fee application, which is "subject to interference only on a showing of an abuse of discretion of the application of incorrect legal principles." See In re Lloyd, Carr & Co., 2 B.R. 714, 715 (D. Mass. 1979).

### A.    The Bankruptcy Court Correctly Found That MCS Compromised Its Secured Claim And Waived Its Right To Reimbursement Of Legal Fees And Costs

The Sale Order expressly and unambiguously states that MCS's secured claim "as determined by compromise agreement with MCS shall be reduced to $1,860,000." AA 172. The express terms of the Sale Order, to which MCS did not object, and the negotiations leading up to the compromise incorporated in the Sale Order lead inexorably to the conclusion that MCS agreed to limit its claim and, by opting to receive a finite payment at the closing, waived any right to attorneys' fees and costs.

By Stipulation dated September 19, 2003 (and approved by the Court on September 26, 2003), MCS agreed to a carve-out from its secured claim, the amount of which was dependent on the ultimate amount of proceeds derived from the sale. See TA 0232-0244. Thereafter, in an effort to overcome the roadblock to the sale created by Bowers, MCS initially agreed that, in lieu of the agreed-upon carve-out, it would agree to a $400,000 reduction of its claim. See TA 1055.

As noted above, the Debtor proposed two alternatives for memorializing this agreement: (i) the Sale Order would provide that MCS's claim be allowed in a fixed dollar amount to be paid in cash at the closing; or (ii) the Sale Order would provide that the sale proceeds be held in escrow, with MCS and any other claimant retaining the right to file claims against such proceeds, but with MCS's claim, as determined by the Court, being reduced by $400,000. TA 1055. MCS opted for the certainty of having its secured claim fixed and paid at the closing. Id.

Consistent with these negotiations, the Sale Order, as originally drafted, provided that MCS's claim would be reduced by $400,000. TA 1055, 1072. This language gave MCS freedom to prove its secured claim in a higher amount, but created the risk that other claimants could be vying for, and would obtain a portion of, the same finite pool of sale proceeds. The Sale Order was then revised as follows: "MCS's secured claim as determined by the Court shall be reduced to $1,860,000, which amount shall be paid by MCS by wire transfer at the closing of the sale." Id. This language, while relieving MCS of the potential risk that its claim would be depleted by any more than the $400,000 to which it had agreed, required MCS to accept a finite claim and thus forfeit any right it may have had to include a claim for fees and costs. MCS accepted this provision, voluntarily electing the certainty of receiving payment in cash at closing and, in so doing, compromising any potential to recover attorneys' fees and costs. Accordingly, the Court correctly ruled that, based on this agreement, MCS cannot now seek payment of additional amounts.

MCS argues that the Sale Order provision reserved its right to seek reimbursement of its legal fees, as evidenced by its provision that "[n]o other change [to the Carve Out Stipulation] is made or implied." This argument is without merit. The Carve-Out Stipulation makes no mention of attorneys' fees and costs; nor does it contain any reservation of rights that could conceivably extend to such fees and costs. See 0234-0244. MCS's argument that it somehow reserved its rights to collect legal fees is therefore misplaced. There is no dispute that, pursuant to the language of the Sale Order, those portions of the Stipulation not dealing with the carve-out amount were not affected by the Sale Order. The flaw in MCS's argument, however, is that nowhere in the Carve-Out Stipulation did MCS reserve its rights to recover attorneys' fees and

11

costs separate and apart from its claim. Put simply, the fact that no other changes were made to the Carve-Out Stipulation does not carry the import that MCS seems to suggest.

Finally, MCS makes the bald assertion that evidence regarding its negotiations with Attorney Erin Fontana, who MCS describes as the "principal attorney representing Debtor," supports its position that the parties understood that MCS was reserving its rights to recover attorneys' fees and costs. As a threshold matter, the underlying record is devoid of any evidence of the alleged negotiations upon which MCS now purports to rely. MCS failed to present any evidence in the fee application hearing whatsoever regarding these alleged discussions.

However, MCS having raised this argument for the first time on appeal, Appellee is compelled to inform the Court that it is entirely disingenuous. The record is abundantly clear that Ms. Fontana, who is an associate at Ropes & Gray, was not lead counsel for the Debtor. All parties in the Chapter 11 case were well aware that Attorney Wilton, a partner at Ropes & Gray, was Debtor's lead counsel. Thus, MCS could not have "reasonably believed that it could rely on negotiations concluded with Attorney Fontana even if the results were inconsistent with earlier oral or written comments made by Attorney Wilton," as it now contends. Finally, Ms. Fontana has informed Appellee that her dealings with MCS in connection with the Sale Order (and, for that matter, all other parties-in-interest) was limited to receiving comments about drafts, relaying them to Attorney Wilton and distributing draft agreements for review. Ms. Fontana was not involved in substantive negotiations. Nor does Ms. Fontana recall ever having spoken to a lawyer or representative of MCS about the subject of attorneys' fees and costs.[4]

_____

[4] Ms. Fontana has offered an affidavit on this matter if deemed necessary or appropriate by the Court.

**B.**    **Having Compromised Its Secured Claim, MCS Is Not Entitled To Recover Fees and Costs Under Bankruptcy Code §506(b)**

As the Bankruptcy Court correctly found, MCS's compromise to accept $1.86 million at closing in satisfaction of its claims included any claim MCS could have asserted, if any, under Bankruptcy Code §506(b) for attorneys' fees and expenses pursuant to Section 8(b) of the Security Agreement dated June 28, 1996.[5]  TA 1051.  Section 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement which the claim arose.

"The purpose of this provision is to codify pre-Code law which permitted over secured creditors to assert *as part of their claim* interest, fees and costs arising under the operative credit agreement."  In re Shapiro, 208 B.R. 318, 321 (E.D.N.Y. Bankr. 1997) (emphasis added) (further citations omitted).  The Bankruptcy Court did not commit reversible error in ruling that any right MCS may have had for attorneys' fees and cost was embedded within its claim.  See id.  By agreement, MCS voluntarily limited its claim.  It cannot now use §506(b) as a means to skirt its agreed-upon cap.  See id.

**C.**    **The Court Correctly Found That MCS Is Not Entitled To Recover Attorneys' Fees and Costs As a Substantial Contribution Under Bankruptcy Code §503(b)(3)(D)**

In order to recover its attorneys' fees and cost under 11 U.S.C. §503(b)(3)(D) [6], MCS has the burden of demonstrating that it made a substantial contribution to this case.  See In re Brown,

---

[5] Section 8(b) of the Security Agreement provides:

> The damages which the Secured Party shall be entitled to recover from the Debtor, in the event of any default in or violation of the terms, provisions and conditions of the Debt shall include all reasonable attorneys' fees, court costs and other expenses which may be incurred by the Secured Party to obtain or enforce payment of, or on account of, any of the Collateral, or in the prosecution or defense of any action or other proceeding concerning any matter arising out of or connected with the subject matter of this Agreement or the Collateral and the foregoing shall constitute "Obligations."

147 B.R. 55, 58 (Bankr. D. Mass. 1992) ("Applicants have the burden of showing their substantial contribution."). MCS has not met this burden. While MCS arguably assisted in the sale proceedings by contributing a portion of its secured claim to the estate in an effort to facilitate negotiations over the objections to the sale, this assistance does not entitle MCS to compensation under the statute. In actuality, MCS agreed to cap its claim to protect its own interests – its desire to be paid from the proceeds of the sale of its collateral – and was the principal beneficiary of its choice to cap its claim at $1.86 million.

Because the proposed sale of the Debtor's assets maximized their value, it was in MCS's interest that the sale go forward. If MCS did not agree to the compromise, there existed a real potential that the sale negotiations would fail and the Debtor would be forced to liquidate, thereby selling its assets in a below-value, piece-meal fashion. If that occurred, MCS would likely have received substantially less than the amount of its secured claim. By agreeing to compromise its claim in order to help effectuate the sale, MCS evaded this risk. Although MCS tries to paint itself as an altruistic bystander, in reality, it benefited from its decision to forego a portion of its claim. That MCS's efforts in advancing its own interests happened to effect an indirect benefit to the estate does not satisfy the "substantial contribution" standard. See, e.g., Brown, supra at 59; Lebron v. Mechem Fin'l Inc., 27 F.3d 937, 944 (3rd Cir. 1994) ("'[S]ubstantial contribution' should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would been undertaken absent an expectation of reimbursement from the estate."); In re Automatic Spring Prods., Inc., 50 B.R. 6, 7 (Bankr. S.D. Fla 1985) (secured creditor was not entitled to award of fees and expenses where

---

[6] It is noteworthy that MCS's fee application did not base its request on §503(b)(3)(D). This argument was raised and refuted in the Joint Objection and addressed by MCS, for the first time, in its response to the Joint Objection.

14

services provided were beneficial primarily to creditor, with incidental benefit to the debtor). By agreeing to cap its claim at $1.86 million, MCS was seeking to protect its own interests; the incidental benefit to the estate does not entitle MCS to recover its attorneys' fees and costs under §503(b)(3)(D). See id.

In any event, as the Court properly found, even if MCS had made a substantial contribution to the case compensable under §503(b)(3)(D), which it was not, such contribution was made prior to the Sale Order incorporating MCS's compromise to limit its claim to $1.86 million. Thus, any claim for attorneys' fees and costs based on MCS's alleged "substantial" contribution is conclusively barred by the subsequent agreement embodied in the Sale Order.

Lastly, the very benefit for which MCS wants to be compensated is its agreement to reduce its claim. However, by seeking an award of its fees, it is actually undermining its own argument by diluting its alleged "substantial contribution" to the case. It defies logic that MCS could make a contribution to the case by reducing its claim on the one hand, and argue, on the other hand, that it is entitled to a portion of that reduction back as "compensation" for its agreement. Certainly, neither the Debtor nor the Unsecured Creditors Committee would ever have agreed to such a bizarre arrangement.[7]

---

[7] The Joint Objection raised many other issues that would have compelled the Bankruptcy Court to disallow MSC's request. Because the Court did not base its ruling on these additional objections, MCS understandably fails to address these issues on appeal. It is worth noting, however, that MCS's fee request is defective for the following additional reasons: (i) MCS failed to allocate its fees to specific tasks as required by Bankruptcy Court Local Rule 2016.1; (ii) MCS seeks reimbursement of fees for noncompensable activities, including, without limitation, planning for an unnecessary Chapter 7 filing and working on a potential credit bid; (iii) MCS failed to certify that no compensation is sought for duplicative services; and (iv) MCS seeks to recover fees for which it did not incur charges from its lawyers. Moreover, MCS also admitted at the February 12, 2004 hearing that it had agreed to a two-tiered fee arrangement dependent upon the amount it received from the estate, an arrangement not previously disclosed to any party. This is expressly proscribed under Massachusetts law. See In re 1095 Commonwealth Avenue Corp., 204 B.R. 284, 293 (Bankr. D. Mass. 1997) (holding that undisclosed "two-tiered fee arrangement" seeking higher fees if payable by the estate constituted fraudulent non-disclosure and misrepresentation). Additionally, and perhaps most disturbingly, Livingston Davies, purportedly one of MCS's attorneys in the underlying proceeding, and the attorney prosecuting this appeal, is, on information and belief, a principal and investor in MCS and received a share of the distribution of MCS's secured claim.

## Conclusion

For the reasons set forth herein, Appellee respectfully requests that the Bankruptcy Court's February 12, 2004 Order denying the Final Application for Approval of Reimbursement Due to the Secured Creditor Micro Control Systems, Inc. be affirmed in its entirety.

Respectfully submitted,

JOHN A. BURDICK, JR., TRUSTEE

By his proposed attorneys,

Michael J. Goldberg (BBO# 551869)
John C. La Liberte (BBO# 556046)
Pamela A. Zorn (BBO# 640800)
SHERIN AND LODGEN LLP
100 Summer Street
Boston, MA 02110
T: (617) 646-2000
F: (617) 646-2222

Dated: May 3, 2004

16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04-40045-NMG

_____

MICRO CONTROL SYSTEMS, INC.

Appellant

v.

CADKEY CORPORATION

Appellee

_____

ON APPEAL FROM AN ORDER OF
THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(WESTERN DIVISION)

_____

**CERTIFICATE OF SERVICE**
_____

I, John C. La Liberte, do hereby certify that on May 3, 2004, I served a copy of the Brief of Appellee, together with appendices volumes I - IV by mailing copies thereof by first class mail postage pre-paid to the following:

John C. La Liberte

Livingston Davies, Esquire
12 Midway Road
Duxbury, MA 02332
(Counsel to Micro Control Systems, Inc.)

James M. Wilton, Esquire
Ropes & Gray LLP
1 International Place
Boston, MA 02110
(Counsel to Debtor)

John A. Burdick, Jr., Esquire
John A. Burdick, Jr., PC
340 Main Street
Worcester, MA  01608
(Trustee)